IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ADRIAN DOGAN-CARR, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-05-1236 |
| | § | |
| SAKS FIFTH AVENUE TEXAS, LP, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM, OPINION, AND ORDER
SETTING STATUS CONFERENCE

The plaintiff, Adrian Dogan-Carr, filed this employment discrimination suit against

her former employer, Saks Fifth Avenue of Texas, L.P. ("Saks"), on April 12, 2005.  Carr

is African-American and had a baby six weeks before her employment was terminated.  She

alleges race and pregnancy discrimination in violation of Title VII, 42 U.S.C. § 2000e *et seq.*,

and 42 U.S.C. § 1981.  Carr specifically alleges that she was discriminated against in

compensation and promotion practices, asserting disparate treatment and disparate impact

theories; that she suffered a racially hostile work environment; and that she was retaliated

against for complaining about unfair treatment.  Saks has moved for summary judgment on

all claims.  (Docket Entry No. 14).  Carr has responded, (Docket Entry No. 15), Saks has

replied, (Docket Entry No. 17), and Carr has surreplied, (Docket Entry No. 19).  Saks has

also objected to and moved to strike parts of the affidavits Carr filed with her response to

Saks's summary judgment motion.  (Docket Entry No. 18).  Carr has responded to Saks's objection and motion to strike.  (Docket Entry No. 20).

Based on a careful review of the motions, responses, and replies, the pleadings, the summary judgment evidence, and the applicable law, this court grants in part and denies in part Saks's motion to strike the affidavit testimony and grants in part and denies in part Saks's summary judgment motion.  Saks's summary judgment motion is granted as to Carr's claims of pregnancy discrimination.  The summary judgment motion is also granted as to Carr's claims of race discrimination and retaliation except the claim that she was demoted from her position as assistant general manager in August 2004 based on race discrimination and retaliation.  The reasons for these decisions are set out below.  A status conference is set for March 23, 2007, at 9:00 a.m.

## I.     Background

Carr worked for Saks Fifth Avenue of Texas, L.P. at its Saks Off 5th store at the Fountains on the Lake Centre shopping plaza in Stafford, Texas from December 2001 until her job was terminated on February 3, 2005.  Carr began working for Saks in November 1996.  She worked for Saks in other cities before moving to the Houston area in December 2001.  Carr moved to Houston from Tucson, where she had worked as the manager for the men's department, a salaried position that paid $25,000 per year.  (Docket Entry No. 14, Ex. A at 36:14–16).  When Carr moved to Houston, she received a $5,000 raise and the position as manager for the women's department at the Saks Fountains store.  (*Id.* at 95:23).  In July 2002, Saks promoted Carr to the position of assistant general manager for the store in

2

addition to manager for the women's department. (Docket Entry No. 15, Ex. B, ¶¶ 8–9). She received a $10,000 raise with that promotion, earning $40,000 per year. (Docket Entry No. 14, Ex. A at 95:19–21).

The Fountains store is subdivided into departments, each staffed by sales associates and selling specialists. The employees within each department report directly to a department manager. The department managers in turn report to the associate general manager and general manager, who manage the store. The general manager reports to the regional vice-president, who has responsibility over several area stores.

As assistant general manager, Carr had the responsibility of working with the general manager on the daily operations of the Fountains store. In her role as department manager of the women's department, Carr directly supervised ten to fifteen employees and was responsible for managing that department. (*Id.* at 54:4–7).

When Carr began working at the Fountains location, Jann Miller was the store's general manager. (Docket Entry No. 15, Ex. B, ¶ 8). It was during Miller's tenure that Carr was promoted to the assistant general manager position while retaining her job as department manager of the women's department. (Docket Entry No. 14, Ex. A at 54:4–7). Carr testified that she had no problems working with Miller. (*Id.* at 46:10–12).

In December 2002, Harle Lyons, a white male, became general manager of the Fountains store and Carr's immediate supervisor. Carr's complaints are directed at Lyons and Nancy Scott, a white female who was department manager for another department in the store.

3

Carr asserts that while working under Lyons's supervision, she endured race-based discrimination. Carr does not allege or provide summary judgment evidence that Lyons made racially offensive comments to her, about her, or in front of her. Carr does present summary judgment evidence that she was told about racially offensive statements Lyons made by coworkers who heard them. Carr submitted an affidavit from Shalendra Thurston, a former Saks employee. Thurston stated that she "often" heard Lyons refer to African-Americans as "niggers" and on one occasion heard Lyons call a cashier at Saks a "black bitch." (Docket Entry No. 15, Ex. D, ¶¶ 5–6). In another affidavit, Sylvia Johnson, a plaintiff in a similar case against Saks, stated that she heard Lyons call the same cashier a "black bitch." (Docket Entry No. 15, Ex. E, ¶ 10). Another former Saks employee, Lori Leal, stated in her affidavit that when she was hired, Lyons told her that he was "scared to hire me because I was black" and that there were "too many black employees at the time in the store." (Docket Entry No. 15, Ex. A, ¶ 8). Leal stated that Lyons told her that he was going to "get rid of them, including Adrian Carr." (*Id.*). Leal also testified that she heard Lyons refer to a group of African-American employees, including Carr, as "ghetto." (*Id.*, ¶ 13).

Carr alleges that Thurston, Johnson, and Leal relayed Lyons's comments to her. Carr found these comments offensive and derogatory. Carr testified that when she complained about the comments to Lyons, he was dismissive and merely said that his remarks were taken out of context. (Docket Entry No. 15, Ex. B, ¶ 11).

Carr alleges that Lyons imposed unreasonable work demands on her.  Carr alleges that she was not given assistance in running the women's department, despite her additional responsibilities as assistant general manager.  (Docket Entry No. 15, Ex. B, ¶ 9).  Carr alleges that similar Saks stores in other Texas cities had one person as the assistant general manager and another person as the manager of the women's department.  (*Id.*, ¶ 10).  Carr states that she was the only African-American assistant general manager and the only one who also had to manage a specific department.  (*Id.*).  She alleges that Lyons did not provide her the assistance she needed because of her race.

The evidence shows, however, that Carr was working as both assistant general manager and department manager before Lyons began as general manager.  Moreover, there is no evidence that Carr specifically complained to Lyons about serving as both assistant general manager and manager of the women's department or that she asked Lyons for an assistant to help manage the women's department.

Carr also asserts that Lyons created animosity between Carr and her subordinates.  According to Carr, Lyons told the sales associates in the women's department that Carr did not want them to attend her wedding and had not sent them invitations.  (Docket Entry No. 14, Ex. A at 155:3–25).  Carr testified that these comments turned what was a pleasant working relationship into a "very tough work environment" with the employees who reported directly to her.  (*Id.*).  Carr testified that during her May 2003 annual review, she complained to Lyons that she felt he did not respect her.  (*Id.* at 158:7–25).  According to Carr, at the end of the meeting, Lyons "stood up, very irate, very angry, took his hand and slammed it on the

5

table and told me that this was his store.  He would run it as he saw fit, that he didn't appreciate my feedback and that he didn't need it." (*Id.* at 162:11–14).  Carr's May 2003 evaluation was positive, however, and she received a $400 raise, bringing her salary to $40,400 annually.  (*Id.* at 96:6–8)

After the May 2003 performance review, Lyons forwarded Carr an email, apparently intended to be humorous, stating that "asskissing" and "bullshitting" were valuable qualities for an employee.  (Docket Entry No. 14, Ex. A at 165:11–21).  Carr was offended because Lyons did not send the email to other managers.  Carr concluded that Lyons was telling her that she would need to "kiss his ass and bullshit with him" to advance at Saks.  (*Id.* at 165:20–21).  Carr asked Lyons why he had not sent the email to the rest of the management team.  Lyons responded that he "just thought [Carr] would find it funny." (*Id.* at 167:17–20).  Lyons did not apologize.  (*Id.* at 165:22–25).

Carr asserts that by September 2003, she felt that Lyons was trying to force her to resign.  (Docket Entry No. 14, Ex. A at 171:2–179:18).  As evidence, Carr describes exchanges she had with Lyons after she had been reprimanded by the regional vice-president, Paul Gedwed, for failing to prepare for a sale.  Carr felt that the reprimand was unwarranted because she had not worked the previous day.  When Carr talked to Lyons about the reprimand, he tried to reassure her by saying that Gedwed was known to be difficult and that she should not take it personally.  Lyons finally asked her, "Well, you say you've had enough.  What, are you like ready to quit?  We're all ready to quit at this point, Adrienne. You know, we're all frustrated." (*Id.* at 174:5–8).

6

After that conversation, Lyons called Saks's regional human resources representative, Mike Schrader, and told him that Carr was ready to quit. (*Id.* at 176:7–13). Schrader called Carr and told her that if she was resigning, he needed to know so he could begin looking for a replacement. (*Id.* at 178:1–20). Carr told Schrader that she was not quitting and that she had not given Lyons any written resignation notice. Carr asked Lyons why he had called Schrader. Lyons replied that he had taken Carr seriously when she said that she was going to quit. Carr acknowledged that she may have told Lyons that she was ready to quit. (*Id.* at 176:18–25). Lyons also told Carr that Paul Gedwed wanted to discuss her plans to resign during his next visit to the store. (*Id.* at 178:23–25). Carr testified that a short time later, Lyons commented to Carr's husband when he was in the store, "Yeah, I don't know what Paul's waiting on. He was supposed to talk to her about her quitting, but he hasn't done it yet. I don't know what he's waiting on." (*Id* at 179:6–10). Gedwed did not talk to Carr about any plans to resign. Carr concluded from this incident that Lyons was trying to force her to resign. (*Id.* at 179:13–14).

Carr contacted Suzanne Johnson, Saks's chief executive officer, to complain that she felt that she was being forced to resign. Carr testified that she told Johnson that she felt Lyons was discriminating against her because of her race and was trying to force her to quit. Carr also told Johnson about the email Lyons had sent, complaining that it was not funny and was unprofessional. (*Id.* at 170:8–19; 179:15–18). Johnson asked Carr whether she, in fact, wanted to quit. Carr answered, "No, I don't." (*Id.* at 207:16–18). Johnson replied, "Okay. Then don't quit." (*Id.* at 207:19). Johnson contacted David Goodes in the human resources

7

department of Saks's corporate office, who in turn told Carr to talk to Lyons to try to clear up any misunderstandings that might be present.  (*Id.* at 180:1–7).

A few days later, Carr asked Lyons to sit down and discuss matters with her.  Carr testified that Lyons was defensive, telling her, "I know that you went to corporate.  I already know that you sent them the email.  They don't care.  They don't see anything wrong with it.  They're going to support me regardless.  Paul Gedwed supports me, Suzanne Johnson supports me and so does Dave Goods [sic].  There was nothing wrong with the email that I sent you." (Docket Entry No. 14, Ex. A at 181:18–23).  Carr later reported back to Goodes that she did not feel the meeting with Lyons had resolved anything.  Carr told Goodes that she was in a "very compromising [sic] position because I still ultimately have to report to [Lyons] and to Paul Gedwed and that things were probably going to be very difficult for me after this point seeing that [Lyons] thought that I went to corporate to tattle on him." (*Id.* at 183:19–184:3).  Goodes thanked Carr for talking with Lyons and told her to keep him informed of any additional difficulties.  (*Id.* at 184:3–5).

Carr testified that shortly after her discussions with Lyons, Johnson, and Goodes, Lyons began scheduling her to work consecutive Saturday evenings.  Carr complained that she was the only manager required to work consecutive Saturday nights.  (Docket Entry No. 14, Ex. A at 184:21–185:6).  Carr complained about her schedule to Lyons.  After she complained, he did not schedule her for consecutive Saturday evenings for a period, but within months she was again scheduled to work consecutive Saturday nights.  (*Id.* at

185:14–25).  The record does not indicate that Carr complained again of being scheduled to work on consecutive Saturday nights.

In early March 2004, an incident occurred between Carr and Nancy Scott, the manager of another department in the store and the only other person Carr specifically accuses of racism.  Carr testified in her deposition that she was talking to Sylvia Johnson—a plaintiff in a related suit against Saks and a selling specialist in the department Scott managed—when Scott approached them and said to Carr, "Well, hell, why don't I just go home then?  Why am I even here?"  (Docket Entry No. 14, Ex. A at  190:6–17).  Carr testified that Scott probably thought she was giving Johnson instructions that Scott—not Carr—should give.  Carr tried to tell Scott that she was not telling Johnson anything that Scott had not already been told.  According to Carr, Scott refused to listen and said, "I don't have to listen to anything you're saying.  I don't have to listen to anything that's coming out of your mouth. . . . You know what?  Why don't you just kiss my ass."  (*Id.* at 191:15–21). Carr responded, "You know what, the next time your voice [is] raised, the next time you talk to me like that, I'm going to . . . write your ass up."  (*Id.* at 191:22–192:2).

Two days later, on March 8, 2004, Carr received a written reprimand in the form of a "corrective interview progress report" from Lyons.  (*Id.* at 192:7–14; Docket Entry No. 14, Ex. A-1).  The progress report did not specifically mention the incident with Scott but stated that Carr needed to work on her communications with staff, peers, and supervisors, on her leadership, and on her follow-through with delegated tasks.  (*Id.*).  The report stated that "Carr is not functioning at an acceptable level as the AGM of the Fountains" and that if she

9

failed to improve her performance within 30 days, further disciplinary action would be taken. (*Id.*).  Lyons signed and dated the report on March 15, 2004.

Carr refused to sign the report.  In the space for employee comments, she wrote, "I had no idea that the company felt that my performance was below standard, yet I have been in this position for [1.5 years].  I would love to have been told a number of these things/issues so that I could improve my performance." (*Id.*).  Carr testified that she felt this report was unwarranted and demonstrated that Lyons wanted to force her resignation.  Carr felt that it was unfair that she had been given a poor performance review because Scott had not been similarly disciplined.  "I don't know if [Lyons] talked to Nancy or not, but she wasn't reprimanded.  I was." (*Id.* at 188:20–21).  Carr was incorrect.  Saks presented summary judgment evidence showing that in fact, Scott was also reprimanded for the same incident.  Saks attached Nancy Scott's "corrective interview" progress report dated March 10, 2004 to its summary judgment motion.  (Docket Entry No. 14, Ex. C).  Scott's progress report stated that she needed to work on communicating better with both managers and associates, among other deficiencies.  The progress report also stated that Scott's failure to improve her performance within 30 days would result in further disciplinary action.  (*Id.*)

On April 26, 2004, Carr received a second written warning from Lyons.  (Docket Entry No. 14, Ex. A-3).  This disciplinary warning stated that Carr had failed to improve her performance since the March progress report in the areas previously indicated: communication, leadership, and follow-through.  The report gave specific examples, including that Carr had not communicated with the management team to ensure that an "RF

scan of men's sportscoats" was prepared on time and failed to follow through with employees to see that signs for a shoe sale were removed promptly when the sale ended. (*Id.*).  The report also stated that Carr's poor leadership performance had resulted in a high attrition rate and a downward sales trend in the women's department during a period when other departments were performing positively.  The report set out guidelines for Carr to follow to improve her performance, including sitting down with certain personnel on a weekly basis to improve communication; preparing an action plan for associate training by a specified date and obtaining Lyons's approval on the plan; and following through with delegated tasks to see that they were completed.  (*Id.*).  Lyons signed the document and dated it May 1, 2004.  Carr again refused to sign the warning, writing instead that "there are several statements that I disagree with [so] I am not signing it."  (*Id.*).

On May 13, 2004, Carr submitted a written rebuttal to the March 10, 2004 corrective interview progress report.  (Docket Entry No. 14, Ex. A-2).  Carr noted that in her 2003 performance review, Lyons gave her exemplary marks for teamwork and communication. Carr blamed other employees, including Lyons, for many of the criticisms in the report.  Carr did not state that she believed that she received this written warning because of her race  but did emphasize that other employees with similar performance problems were not given poor reviews.  (*Id.*).

On May 21, 2004, Carr submitted a lengthy written rebuttal to the April 26, 2004 warning.  (Docket Entry No. 14, Ex. A-4).  As in the earlier rebuttal, she blamed other employees for the problems and pointed out that these employees had similar shortcomings

but went unpunished. Carr stated that the reprimand "just proves my point that I am consistently being singled out and graded on a different set of rules." (*Id.*). She ended the rebuttal by saying, "I hope I am not speaking prematurely, however, things are definitely looking like what they seem." (*Id.*). In her deposition, Carr explained that "I would hate to call Saks Fifth Avenue a company where associates and management alike are discriminated against. That's what I meant about I'm hoping I'm not speaking prematurely, but it does look that way." (Docket Entry No. 14, Ex. A at 243:3–6).

Carr's belief that she was "singled out" for disciplinary action was again incorrect. Saks submitted summary judgment evidence of written disciplinary warnings given during the same period to other managers, who were not African-American. (Carr's only sex discrimination complaint is pregnancy discrimination, and Carr does not allege that her pregnancy was an issue during this period.) Besides the reprimand to Nancy Scott, who is Caucasian, on March 10, 2004, an operations manager, Mireya Guerra, who is Hispanic, was given a written corrective interview instructing her to work on meeting deadlines, training associates, scheduling, and time management. (Docket Entry No. 14, Ex. B-1). On April 20, 2004, Guerra was given a written warning stating that she had not improved her performance adequately since her prior interview. (Docket Entry No. 14, Ex. B-2). On June 5, 2004, Guerra received a final warning. (Docket Entry No. 14, Ex. B-3). Guerra's employment ended in June or July 2004. (Docket Entry No. 14, Ex. A at 67:1-11).

By the end of May 2004, Carr asked for and received FMLA medical leave due to pregnancy complications. Carr was on paid FMLA leave for June and July 2004. She

returned to work on August 1, 2004.  Carr alleges that Lyons's efforts to force her resignation continued when she returned, citing the fact that Lyons required her to work for five consecutive days in her first week back.  (Docket Entry No. 14, Ex. A at 212:5–16).  Carr asked for flexibility in her scheduling due to her pregnancy, but Lyons allegedly refused. Carr asserts that she was the only manager required to work five consecutive days.  (*Id.*). Saks does not rebut the allegation that Carr was required to work five days in a row, but states that this action does not meet the standard for an adverse employment action.

Carr alleges that when she returned from her FMLA leave, Lyons had effectively "stripped" her of her assistant general manager duties, amounting to a demotion.  (Docket Entry No. 15, Ex. B, ¶ 34).  During Carr's leave, Lyons had hired Claire Huynh to replace Guerra as operations manager.  (*Id.* at 67:12–14).  Lyons also gave Huynh the title of assistant general manager and, according to Carr, assigned her Carr's assistant general manager duties.  (*Id.*).  Carr presented evidence that she was like "an AGM with limited access" when she returned from her FMLA leave in August.  (Docket Entry No. 14, Ex. A at 69:17).  Carr states that the associates in the women's department handled her responsibilities while she was on leave in June and July and that she assumed only those duties on her return.  Saks disputes that Hyunh had assumed most of Carr's assistant general manager duties, pointing to evidence that Carr retained the title and the salary.  Saks also argues that the evidence showed that Hyunh did not perform all the assistant general manager duties, but that both Carr and Hyunh filled different assistant general manager roles—Carr was the assistant general manager of merchandise (and the manager of the women's

department), while Huynh was the assistant general manager of operations (and the human resources manager).  (Docket Entry No. 15 at 16).

In support of her allegation that she was effectively demoted, Carr submitted the affidavit of Lori Leal, who worked in the Fountains store human resources department.  Leal stated that Lyons introduced Huynh as Carr's replacement.  (Docket Entry No. 15, Ex. A, ¶ 17).  Carr also presented evidence of changes that she asserted showed that she had been effectively demoted:  she was removed from the distribution list of the "census sheet," a management document that contained employees' hours and pay scales; she was denied permission to make adjustments to the employees' work schedules; her name was removed from a contact sheet posted in the customer service area; she was told to move her office without prior consultation; and she heard Hyunh say that she would not need to interview a new employee applicant.

The census sheet was a document distributed to the general manager, the assistant general manager, and certain human resources employees, listing employees' pay rates and hours worked.  (Docket Entry No. 14, Ex. A at 70:1–9).  Carr routinely received the census sheet before she went on leave in June 2004.  When she returned, Huynh's name had replaced Carr's on the census sheet distribution list.  (*Id.* at 70:12–13).  Carr testified that she learned about the change shortly after her return to work in August, when someone in the corporate office asked her to provide the census sheet and she was told that she did not have authorization to access it.  (*Id.* at 73:19–74:20).  Carr acknowledged that she did not use the census sheet on a regular basis in her job as assistant general manager.  However, she

believed that it was part of her job as assistant general manager to receive the census sheet and provide information from it when requested.  (*Id*. at 72:6–9).

Carr also cited as evidence of demotion that when she returned from her FMLA leave in August 2004, she was no longer allowed to make adjustments to the employees' work schedule.  Before Carr's leave, she and Lyons both had access to the employees' schedules and both were authorized to make changes as needed.  During Carr's leave, Saks had changed to a computerized payroll and scheduling system.  When Carr returned to work in August, Huynh had assumed the responsibility of making adjustments to the schedules. (Docket Entry No. 14, Ex. A at 75:20–76:11).  According to Carr, Lyons sent her an email telling her not to change the schedule; that only he, Huynh, and an individual in human resources were allowed to do so; and that if anyone tried to adjust the schedule they would receive a disciplinary write-up.  (*Id.* at 76:14–19).

Carr also states that when she returned in August 2004, her name had been removed from a list of names and telephone numbers of people on the management team posted in the customer-service department.  (Docket Entry No. 14, Ex. A at 77:2–78:20).  Before Carr left in May 2004, the list had Lyons's name at the top, as general manager, with Carr's name directly below, as assistant general manager.  When Carr returned from her FMLA leave, Huynh's name and number had replaced hers.  "It would be one thing if her name was added in addition to mine.  I see nothing wrong with that.  But for my name to be deleted altogether and hers to replace mine, I do see a problem with that because that's telling me that she now has my job and I no longer have that position."  (*Id.* at 78:16–20).  When Carr complained

15

to Lyons about being taken off the contact list, Lyons told her that it was nothing and she should not be concerned about it.  (*Id*.).

Carr also testified that after she returned, her office was moved, without prior consultation. (Docket Entry No. 14, Ex. A at 85:1–87:10).  Carr testified that she came back from lunch one afternoon in August 2004 and found her belongings being moved to another office.  Although the record is not clear, it appears that Huynh moved into Carr's old office. (Docket Entry No. 15, Ex. B, ¶ 34).  Carr complained to Lyons about the move and about not being consulted before it happened.  Carr testified that she believed it showed disrespect toward her.  Lyons told Carr that the move made practical sense because it placed her closer to the women's department and placed Huynh closer to the department she managed; Carr does not dispute this explanation.  Lyons also acknowledged that he should have discussed it with Carr first.  (Docket Entry No. 14, Ex. A at 86:11–20).  Carr did not complain to anyone else at Saks about the move or the way it had been handled, but it was the catalyst for her complaint to the EEOC.

The last piece of evidence Carr points to as support for her claim that she was demoted is a conversation she overheard between Huynh and Leal about a potential hire. (Docket Entry No. 14, Ex. A at 88:7–90:14).  Leal told Huynh that she thought Carr should interview the applicant. Huynh responded, "She doesn't need to interview anybody.  I can do that." (*Id.* at 89:25–90:1).  Leal replied, "Okay, have you told this to her?"  Huynh stated, "No.  I don't need to tell this to her." (*Id.* at 90:2–3).  Saks responds that none of these allegations amount to an adverse employment action.

16

On October 20, 2004, Carr filed a complaint with the EEOC, alleging that she had been discriminated against because of her race and pregnancy. (Docket Entry No. 1, Ex. A). Carr states that she filed the complaint after Lyons made her move offices because she thought this meant that he was "trying to push me out of the building." (Docket Entry No. 14, Ex. A at 221:3–7). Carr's EEOC complaint alleges that she was singled out for enforcement of company policies that did not apply to non-African-American and nonpregnant employees. The EEOC issued a right-to-sue notice on January 25, 2005, authorizing Carr to file suit within 90 days. (Docket Entry No. 1, Ex. B).

In late October 2004, Carr was again experiencing pregnancy complications. She contacted Lorraine Keeling in the human resources department about obtaining the paperwork for another leave of absence. Carr testified that she asked how much FMLA leave time she had left. Keeling told Carr that she had three weeks of FMLA leave and two weeks of paid vacation remaining. Carr also had 26 weeks of short-term disability benefits available as an executive employee of Saks. (Docket Entry No. 15, Ex. B, ¶ 35; Ex. H). Carr acknowledged that Keeling told her that after the three weeks of FMLA leave expired, Saks was not obligated to hold her job for her. (Docket Entry No. 14, Ex. A at 136:9–14).

Keeling gave Carr the necessary paperwork to obtain a medical leave. (Docket Entry No. 14, Ex. A at 122:23–125:9). Carr testified that she believed she had completed the paperwork necessary to obtain sick leave, FMLA leave, and short-term disability benefits. (*Id.* at 249:1–11). On October 29, 2004, Carr took her second FMLA leave of absence. Carr delivered her baby on December 23, 2004. She did not return to work at Saks and did not

17

provide any information on when she expected to be able to return to work. Carr apparently believed that she could remain on leave until her short-term disability benefits expired without telling Saks whether or when she expected to return to work, then return to work at Saks. Carr was paid from October 29, 2004 until February 15, 2005, when she was told that her position at Saks was terminated. Carr did not make any inquiry as to whether there was any other position available for her at Saks. (*Id.* at 136:15–17).

From November 2004 to mid-February 2005, Carr did return to the store approximately every two weeks to pick up her paychecks. She testified that on one of these visits, she talked with Lori Leal in human resources and was assured that her leave paperwork was in order. (*Id.* at 140:1–21). Carr acknowledged that she did not provide any information about when she might be able to come back to work after her baby was born. Saks states that it sent Carr letters asking when she intended to return to work and telephoned her, but received no response. (Docket Entry No. 15, Ex. H). Carr testified that she and her family moved into a new home during the first week of November 2004. Saks was sending the letters to the former address. Carr testified that she had given Lyons her new contact information. (Docket Entry No. 14, Ex. A at 138:8–20). Carr did not, however, give the new contact information to human resources, although she had frequent contact with that office. Lyons left his job at Saks in November 2004, very shortly after Carr began her second FMLA leave. (*Id.* at 140:22–141:9; Docket Entry No. 15, Ex. G). The Saks human resources department did not have Carr's correct address after she moved.

On February 15, 2005, Carr went to the Fountains store to pick up a paycheck. Candace White, Lyons's replacement, told Carr that her position had been terminated. (Docket Entry No. 14, Ex. A at 147:20–24). Carr received a termination letter from David Goodes at the Saks corporate office dated February 2, 2005. (Docket Entry No. 15, Ex. H). The letter stated that Carr had exhausted her FMLA benefits in December 2004 and that the company had hired a replacement for her position. The letter also stated that Carr had 26 weeks of short-term disability benefits and that once she had exhausted those benefits, her employment with Saks would be "separated." (*Id.*).

Carr testified that when she began her second leave of absence related to her pregnancy, in late October 2004, she understood that she was not guaranteed the position she held when her leave began. Carr understood that after her FMLA benefits expired, which occurred in December 2004, she was not guaranteed a job at all. (Docket Entry No. 14, Ex. A at 134:17–20; 136:9–14). Carr believed that when she was able to return to work, she would be eligible for an available position at Saks. Carr did not apply for another job with Saks after receiving Goodes's letter. (*Id.* at 147:2–148:6). Instead, she filed this suit.

Carr also alleges discrimination in pay. At the time she was discharged, Carr was earning approximately $40,400 annually. She had received a $400 raise in May 2003, after her positive annual performance evaluation. (*Id.* at 96:6–8). Only two other employees earned more than Carr while she worked at the Fountains store: Harle Lyons, the general manager, and Claire Huynh, who was hired as an assistant general manager during the summer of 2004. (Docket Entry No. 15, Ex. G). The "Associate Hire Confirmation Report"

for Hyunh states that she was hired as the assistant general manager for merchandise and earned a $50,000 salary.[1]   (Docket Entry No. 14, Ex. D).   Saks submitted as summary judgment evidence Huynh's job application with the company.   (*Id.*).   The application showed Huynh had extensive prior management experience, including as store manager for a large retail store (earning $45,000 per year) and a senior area manager before that.   Huynh graduated from high school in 1974 and attended some college.   Hyunh had been recognized for outstanding performance by her prior employers.   When she applied for the Saks position, Huynh indicated that she would accept no less than a $48,000 per year salary from Saks. Saks asserts that the salary differences reflect differences in prior management experience between Carr and Hyunh.

Carr was initially replaced by a Caucasian female, Theresa Pina.   (Docket Entry No. 14, Ex. E at 83:22–84:7; 86:13–87:2).   Pina worked for Saks for less than one month.   (*Id.*). Saks replaced Pina with an African-American female named Dierdre Dickens.   In April 2006, Dickens was on maternity leave pregnant with twins and was expected to return to her job at Saks.   (*Id.* at 84:1–2; 128:3–14).   Dickens was paid $2,000 per pay period.   According to Saks's employment records, Pina earned $1,875 per pay period, while Carr had earned $1,683.33.   (Docket Entry No. 15, Ex. G).

---

[1]   Although Huynh's "Associate Hire Confirmation Report" states that Huynh was hired as the "ASST GEN MGR MDSE 2," the same title Carr held, there is conflicting evidence in the record that shows Huynh as the assistant general manager in charge of operations.   A Saks employee chart submitted by Carr in response to the summary judgment motion lists Huynh's job title as "ASST STR/GEN MGR OPE," while Carr's job title is listed as "ASST GEN MGR MDSE 2."   (Docket Entry No. 15, Ex. G).

To support her allegation that Lyons's treatment toward her was based on racial animus, Carr presents summary judgment evidence of how Lyons treated African-American employees and customers, in addition to the evidence that Lyons made racially offensive remarks.  The summary judgment record contains affidavits from Carr, other employees, and one from a regular Saks customer.  In her affidavit, Carr claims that Lyons installed a security camera that he used to monitor the African-American employees, but that he did not similarly monitor non-African-American employees.  (Docket Entry No. 15, Ex. B, ¶ 24).  Carr states that African-American employees were routinely passed over for promotional opportunities, denied requests for higher compensation, paid less, and held to a higher accountability standard than were non-African-American employees.  (*Id.*, ¶¶ 13–21, 25–27).  Margaret Johnson, a customer service employee whose duties included disbursing payroll checks and doing financial audits of the cash office, states in her affidavit that she saw a disparity in pay between African-American associates and other associates on the sales floor and in the customer service department.  (Docket Entry No. 15, Ex. C, ¶ 4).  Johnson stated that Sylvia Johnson was the most productive of the selling specialists but was paid at least $3.00 per hour less than two white counterparts, Jess Bowman and John Gibson.  (*Id.*).  Carr's affidavit notes that another white sales specialist, Walter Broussard, made at least $3.00 more per hour than Sylvia Johnson.  (Docket Entry No. 15, Ex. B, ¶ 14).  In her affidavit, Sylvia Johnson states that her requests for a pay raise in 2003 were denied on several occasions even though her sales numbers were the highest of any of the selling specialists at the time.  (Docket Entry No. 15, Ex. E, ¶ 9).

Carr submitted an employee earnings chart that shows Bowman employed as a "Selling Spec Off 5th" and earning $13.94 per hour. (Docket Entry No. 15, Ex. G). Gibson's title is listed as "Sales Assoc SFAE"; he made $11.70 per hour. (*Id.*). Broussard is listed as a salaried "Sales Mgr" earning $1,343.29 per pay period. (*Id.*). The earnings chart states that Broussard's "Sales Mgr" position began August 1, 2004. Carr also submitted a copy of Broussard's April 9, 2004 paycheck stub, which shows that he earned $13 per hour; it does not provide his job title at that time.[2] (*Id.*). Sylvia Johnson's position is listed as "Sales Assoc SFAE" and she earned $10.30 per hour. (*Id.*).

Shalendra Thurston, an African-American sales associate, submitted an affidavit in which she stated that she had been working in the customer service department for approximately one year when she inquired about the lead cashier job. She stated that Lyons denied her application and hired a non-African-American employee without experience in cashiering or auditing. (Docket Entry No. 15, Ex. D, ¶ 9). Lyons subsequently required Thurston to train the new employee for the position. (*Id.*).

Several former Saks employees also stated that Lyons treated African-American employees differently than other employees. Margaret Johnson stated that Lyons never disciplined a non-African-American sales associate for his routine tardiness, unprofessional appearance, or when his cash register failed to balance. (Docket Entry No. 15, Ex. C, ¶ 5). According to Carr, on another occasion, Lyons refused to punish a Caucasian female sales

---

[2] Broussard's April 9, 2004 paycheck stub shows that during the pay period ending April 3, 2004, Broussard worked 39.78 hours and earned $517.14, which equates to $13 per hour. (Docket Entry No. 15, Ex. G).

associate for using profanity toward a fellow employee and attempting to instigate a fight. (Docket Entry No. 15, Ex. B, ¶ 17).  Lyons reportedly refused to discipline a white male employee who had called an African-American coworker a "black bitch."  (*Id.*, ¶ 18). According to Lori Leal, Lyons also refused to discipline a non-African-American cashier whose cash register did not balance on four separate occasions.  (Docket Entry No. 15, Ex. A, ¶ 15).  In Carr's affidavit, she stated that Lyons  praised one non-African-American employee's shouting match with a customer in which the employee reportedly called the customer a "bitch" and cursed her in Lyons's presence.  (Docket Entry No. 15, Ex. B, ¶ 26). Carr alleges that the next day, she saw Lyons hang a sign in the break room that said "Go Slugger" in apparent praise for the employee's conduct the previous day.  (*Id.*, ¶ 27).  Lyons also allegedly gave a white male employee a "high-five" after hanging the sign.  (*Id.*).  Carr states that the employee was never sanctioned for the incident.

Carr alleges that Lyons closely scrutinized merchandise returns of African-American customers and monitored them closely, more than he would non-African-American customers.  (Docket Entry No. 15, Ex. B, ¶ 22).  Margaret Johnson, who worked in customer service, stated in her affidavit that Lyons routinely asked African-American customers attempting to return items, "Did you wear this?  Why are you returning it,—what's wrong with it?" and checked the security cameras and register tapes before approving a store credit. (Docket Entry No. 15, Ex. C, ¶ 7).  Johnson did not see Lyons conduct similar inquiries with other returns.  Lyons also reportedly enforced the Saks policy of allowing returns only if the customer had a receipt and the tags were still on the item for African-American customers

but frequently waived the requirements for returns by other customers.  (*Id.*).  Another former Saks employee, Shalendra Thurston, stated in her affidavit that she saw Lyons allow a Caucasian customer return merchandise that came from another department store and receive store credit without any questions asked.  (Docket Entry No. 15, Ex. D, ¶ 14).

Jennifer Aitsebomo, an African-American customer who shopped at the Saks Fountains store multiple times each week, testified that she witnessed several Caucasian customers return merchandise without receipts.  (Docket Entry No. 15, Ex. F, ¶ 8).  Aitsebomo states that Lyons would approve the returns without question.  When Aitsebomo tried to return some jewelry one afternoon, however, Nancy Scott, the manager of the accessaries department, would not give her the full price for her return and refused to discuss the matter with her.  (*Id.*, ¶ 7).  On another occasion, Scott approached Aitsebomo as Sylvia Johnson was helping her select some merchandise.  Scott reportedly stated without prompting that her parents were once slave owners and had taught slaves.  Aitsebomo found this offensive.  (*Id.*, ¶ 10).  Scott later asked Aitsebomo how she could afford to purchase nine designer handbags.  Aitsebomo believed this was a racially charged remark.  (*Id.*, ¶ 11).  From these events, Aitsebomo believed that Scott and Lyons discriminated against her because of her race.

Saks objects to much of this affidavit testimony and moves to strike those portions it finds objectionable.  (Docket Entry No. 18).  The motion to strike and Carr's response are addressed below.

## II.     The Motion to Strike the Summary Judgment Affidavits

24

Saks objects to portions of the following summary judgment evidence:  Lori Leal's affidavit, (Docket Entry No. 15, Ex. A); Adrian Dogan-Carr's affidavit, (Docket Entry No. 15, Ex. B); Margaret Johnson's affidavit, (Docket Entry No. 15, Ex. C); Shalendra Thurston's affidavit, (Docket Entry No. 15, Ex. D); Sylvia Johnson's affidavit, (Docket Entry No. 15, Ex. E); and Jennifer Aitsebomo's affidavit, (Docket Entry No. 15, Ex. F).  Saks objects that these affidavits contain anecdotal evidence that is inadmissible because it is hearsay, unsubstantiated, and speculative.  Saks also argues that portions of Carr's affidavit contradict her deposition testimony and should be excluded.

Federal Rule of Civil Procedure 56(c) provides that "judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Rule 56(e) clarifies that

> affidavits shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.  Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto and served therein.  The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.

FED. R. CIV. P. 56(e).

### A.    Lori Leal's Affidavit

Saks objects to paragraphs 3 through 6 of Lori Leal's affidavit, which describe the process by which employees were granted leave, because it is not based on personal

25

knowledge.  The objection to those paragraphs is denied.  Leal testified that she worked as a human resources associate whose duties included overseeing employee benefits.  (Docket Entry No. 15, Ex. A, ¶ 2).

Saks argues that paragraph 7, which states that Leal saw Lyons and other Saks management treat African-Americans "less fairly," is unsupported by specific facts.  This objection is also denied.  The paragraphs that follow in Leal's affidavit provide specific instances of treatment that Leal witnessed.  (*Id.*, ¶¶ 8–19).

Saks also objects that the following statement in paragraph 9 of Leal's affidavit is unsupported by specific facts and is speculative:  "I understood at that time that [Sylvia] Johnson was highest in sales among selling specialists."  Carr argues that Leal's statements were based on personal observations, but does not identify what observations provided the foundation for her belief.  Leal worked in human resources.  Her job duties included "distributing payroll, approving returns, customer service, and overseeing scheduling and employee benefits."  She stated that she had daily interactions with the selling specialists and other employees, but the record does not show that she had personal knowledge of the sales figures of different personnel.  (Docket Entry No. 15, Ex. A, ¶ 2).  There is no factual basis provided for the statement that Leal believed that Johnson's sales numbers were the highest of the selling specialists.  *See Grimes v. Tex. Dep't of Mental Health & Mental Retardation*, 102 F.3d 137, 139 (5th Cir. 1996) ("Needless to say, unsubstantiated assertions are not competent summary judgment evidence.").  Saks's motion to strike this part of paragraph 9 is granted.

Saks objects that the following part of paragraph 9 in Leal's affidavit is speculation: "Mr. Lyons told me to put the payroll away because he did not want Mrs. Carr to see the disparity in pay of African-Americans to others."  It is unclear if Leal is repeating what Lyons told her was his reason for instructing her to put the payroll away or if Leal is speculating as to why Lyons gave her that instruction.  If it is the latter, the objection would be well-taken.  If Leal is repeating what she heard Lyons state, the objection would be denied.

Saks also objects to paragraphs 10 through 12 of Leal's affidavit, in which she stated that Sylvia Johnson was "set up" for termination by Lyons and others.  Saks argues that Leal's belief is not based on personal knowledge, that many of the statements in these paragraphs are based on hearsay and speculation, and that many of the statements are contradicted by Johnson's deposition testimony.  Leal stated that she was in a meeting when Lyons instructed Nancy Scott and another Saks employee to fabricate disciplinary actions against Johnson.  Leal also stated that she was instructed to help.  (Docket Entry No. 15, Ex. A, ¶ 11).  Such testimony is not speculative.  The statements attributed to Lyons are admissions of a party opponent under Rule 801(d) of the Federal Rules of Evidence.  Saks does not indicate which portions of Johnson's deposition testimony it believes are contradictory to Leal's affidavit testimony.  The motion to strike paragraphs 10 through 12 of Leal's affidavit is denied.

Saks objects that the individuals who are the subjects of paragraphs 14 and 15 of Leal's affidavit were not similarly situated to Carr.  To the extent this objection challenges

27

the relevance of these paragraphs, it is overruled.  These paragraphs are based on personal observations and discuss statements and conduct by Lyons and Nancy Scott, the people Carr complains of in this suit.  *See Shattuck v. Kinetic Concepts, Inc.*, 49 F.3d 1106, 1109–10 (5th Cir. 1995) ("There is no proscription of evidence of discrimination against other members of the plaintiff's protected class; to the contrary, such evidence may be highly probative, depending on the circumstances."); *Visser v. Packer Eng'r Assoc., Inc.*, 924 F.2d 655, 659–60 (7th Cir. 1991) (en banc) (stating that evidence of fellow employees testifying in civil rights suits to racial slurs or other acts of racial discrimination against them by the employer are admissible because they are based on personal observation and other grounds of personal knowledge).

Saks objects to paragraph 16 of Leal's affidavit as unsupported by specific facts.  Leal stated that she saw Lyons review security tapes before approving returns for African-American customers but did not see him do so for non-African-American customers.  This statement is based on Leal's personal observations.  To the extent that paragraph 16 makes conclusions beyond what was just described, this court will not consider such statements.

Saks also objects to paragraph 17, arguing that it contains nothing more than Leal's subjective belief and is unsupported by specific facts.  In paragraph 17, Leal stated that she helped Carr prepare the paperwork for her June 2004 FMLA leave and that while Carr was on leave, Lyons introduced Huynh as Carr's replacement.  The paragraph is based on personal knowledge.  The motion to strike paragraph 17 is denied.

Saks also objects to the statement in  paragraph 18 of Leal's affidavit, that Lyons did not want Carr to return to Saks after her first leave of absence, as conjecture and speculation. This court agrees.  The first sentence of paragraph 18 is stricken from the summary judgment evidence.

### B.      Adrian Dogan-Carr's Affidavit

Saks objects to paragraph 7 of Carr's affidavit, which relates the treatment of a white Saks employee in the Tucson, Arizona store who took an extended leave of absence.  Saks objects that this paragraph is irrelevant.  In this lawsuit, Carr complains of conduct by Lyons and Nancy Scott; the treatment of Saks employees in other locations under different management is irrelevant.  The motion to strike paragraph 7 is granted.

Saks also objects to paragraph 10 on similar grounds.  In paragraph 10, Carr states that she was treated differently than the assistant general managers of other Saks stores in Texas because she also had to manage the women's department, while the (non-African-American) assistant general managers of the other stores did not carry this dual responsibility.  The treatment of assistant general managers at other stores is not relevant to determining whether Lyons treated Carr differently than *he* treated other similarly situated employees.  The motion to strike paragraph 10 is also granted.

Saks moves to strike paragraph 11 on the ground that Carr has no personal knowledge of Lyons's use of racial slurs.  Carr's knowledge of the statements in paragraph 11 all came through other employees.  Testimony from these employees relating Lyons's racial slurs made to them or in front of them is not hearsay.  "'Hearsay' is a statement, other than one

made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801(c). As a general rule, "[h]earsay is not admissible except as provided by these rules." FED. R. EVID. 802. Federal Rule of Evidence 801(d)(2) provides in pertinent part:

> A statement is not hearsay . . . if the statement is offered against a party and is (A) the party's own statement in either an individual or a representative capacity, or . . . (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.

A statement by a supervisory official who plays a role in the decisionmaking process is generally admissible. *See, e.g.*, *Miles v. M.N.C. Corp.*, 750 F.2d 867, 873–75 (11th Cir. 1985). The statements by Saks employees describing what Lyons said to them or in front of them are admissible as a party admission under Rule 801(d)(2)(A), as well as a statement by a supervisor about a matter within the scope of his agency under Rule 801(d)(2)(D). Carr's testimony about what coworkers told her about what Lyons told them or said in front of them presents a "double hearsay" problem. Under the federal rules, "[h]earsay within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." FED. R. EVID. 805; *see United States v. Pendas-Martinez*, 845 F.2d 938, 942–43 (11th Cir. 1988) (both levels of hearsay must be excepted from the hearsay rule).

Courts generally hold that a statement by a coworker relating the alleged statement of a supervisor with decisionmaking authority does not concern a matter within the scope of

the coworker's employment when the declarant is neither the plaintiff's supervisor nor has a significant role in the employment decision at issue.  In *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1456–57 (11th Cir. 1997), the court held that the plaintiff's testimony that his coworkers told him that his supervisor had made age-biased statements to them was inadmissible hearsay.  The hearsay problem rested in the statements by the coworkers to the plaintiff, because those statements were not made within the scope of the declarants' authority at the company. In *Jacklyn v. Schering-Plough Healthcare Products Sales Corp.*, 176 F.3d 921, 927–28 (6th Cir. 1999), the court held that statements were not within scope of employment when the declarant was not the plaintiff's supervisor during the relevant period and was not involved "in any of the critical appraisals or her performance that preceded her leaving work."  This approach dovetails with the principle that statements regarding employment matters are within the scope of employment if the declarant was "an advisor or other significant participant in the decision-making process that is the subject matter of the statement."  *Breneman v. Kennecott Corp.*, 799 F.2d 470, 473 (9th Cir. 1986) (holding that statements were not within the scope of employment when the declarants relating what a decisionmaker said were not involved in the company's discharge of the plaintiff); *see also Howley v. Town of Stratford*, 217 F.3d 141, 155 (2d Cir. 2000) (testimony by the plaintiff that other firefighters told her of statements by a supervisor was inadmissible to prove that the supervisor actually made the statements); *cf. Bevan v. Honeywell, Inc.*, 118 F.3d 603, 610–11 (8th Cir. 1997) (statement by the plaintiff's immediate supervisor relating what a supervisor with greater authority had said about the relevant employment decision

31

was within the scope of the immediate supervisor's employment); *Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1215–16 (3d Cir. 1995) (holding that plaintiff's coworker could testify to what supervisor had said to him about the "criteria utilized by management in making decisions on hiring, firing, compensation, and the like"; the statement was not double hearsay because the coworker himself, rather than the plaintiff, was offering the testimony); *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1238 n.1 (2d Cir. 1995) (statements of intermediate supervisors relating the statement of a superior with decisionmaking authority were within the scope of employment when one of the intermediate supervisors had been instructed to fire the plaintiff and the other was plaintiff's immediate supervisor who reported to the superior on the plaintiff's performance and status); *Zaken v. Boerer*, 964 F.2d 1319, 1323 (2d Cir. 1992) (statement by a supervisor who "had ostensible authority over and took part in personnel decisions regarding hiring and firing of sales staff" was within the scope of employment and was admissible when testified to by a nonplaintiff employee who heard the statement first hand).

Carr's statement in paragraph 11 that another Saks employee told her what Lyons said to or in front of that employee raises a double hearsay problem. The objection is sustained with one exception. This paragraph is admitted only to show how Lyons reacted to the accusation that he made the statements attributed to him. Carr stated in that paragraph that when she asked Lyons whether he had made the statements, he "simply dismissed my complaint and said that his racial slurs were taken out of context." (Docket Entry No. 15, Ex. B, ¶ 11). The motion to strike paragraph 11 is granted except for this limited purpose.

32

Saks also objects to paragraph 12, arguing that it is unsupported by specific facts.  In that paragraph, Carr stated that while she was employed at Saks, she saw Lyons, Scott, and Guerra discriminate against African-Americans.  Carr provided some factual basis for the statement.  She stated that she saw disparity in pay between African-American employees and others on the census sheets.  She stated that she saw African-American employees receive disciplinary action while other employees received none for similar actions, although the record shows that on at least two occasions, Carr had incorrect information about what disciplinary actions were given to employees.  She also stated that she personally saw African-American customers receive more scrutiny in returning their merchandise than other customers received.  Paragraph 12 is supported by specific instances of Carr's personal observations.  The motion to strike paragraph 12 is denied.

Saks also objects to paragraph 13, stating that neither Huynh nor assistant general managers from other Saks stores are similarly situated to Carr.  The parts of paragraph 13 that compare Carr's pay to that of other assistant general managers in other Saks stores is struck on the basis of relevance.  As to the statements in paragraph 13 comparing Carr's pay to that of Huynh's, the motion to strike is denied.  Both Carr and Huynh were assistant general managers in the same store at the same time.

Saks also moves to strike paragraph 14, in which Carr stated that Sylvia Johnson and Karlene Harris made "a substantially lower wage than the other non-African-American selling specialists."  (Docket Entry No. 15, Ex. B, ¶ 14).  Carr stated that she had regular access to the census sheet, which listed the employees' names, their positions, and their pay

33

rates.   However, Carr has not provided information as to the experience, length of employment, or other factors that affect compensation for these different employees.  The motion to strike paragraph 14 is granted.

Saks objects to paragraph 15, arguing that the individuals referred to in that paragraph are not plaintiffs in this suit.  This court strikes paragraph 15 on the basis that there is no factual support identified.

Saks also moves to strike paragraph 17.  That paragraph details an incident Carr witnessed in which a white sales associate named Susan Grisales had an altercation with a female Hispanic coworker.  Carr stated that when she reported the incident to Lyons, he refused to take disciplinary action toward Grisales.  Carr alleges that Lyons routinely treated white employees more favorably than African-American employees.  The motion to strike is granted in part and denied in part.  This paragraph is relevant only as evidence of Lyons's alleged racial animus.

Saks also moves to strike paragraph 18 on the basis that the incident described in that paragraph is irrelevant.  The incident involved a Caucasian employee who allegedly made a racial slur to another employee.  Carr states that Lyons refused to discipline the employee who made the remark.  The incident in paragraph 18 is relevant only to the contention of a racially hostile work environment and as evidence of Lyons's alleged racial animus.

Saks also objects to paragraphs 19 through 21, which describe how Lyons treated a sales associate, Shalendra Thurston.  The motion to strike paragraphs 19 through 21 is granted on the basis of relevance.

34

Saks moves to strike paragraph 22 of Carr's affidavit, arguing that it is unsupported by specific facts. Carr testified that she saw Lyons pull security tapes and journal tapes when African-American customers would return merchandise, but never saw him conduct a similar investigation when other customers returned merchandise. The motion to strike paragraph 22 is denied.

The motion to strike paragraphs 23 and 24, in which Carr relates statements reportedly made by Lyons relayed to Carr by other employees, is granted; the statements are double hearsay.

The motion to strike paragraphs 25 and 26, which deal with Lyons's favorable treatment of a non-African-American employee, is granted; there is no personal knowledge shown as the basis for these paragraphs.

The motion to strike the statement in paragraph 27, describing Carr's observation of Lyons placing a sign in the break room congratulating an employee who had confronted a customer, is granted in part and denied in part. It is admitted as relevant to the racially hostile work environment claim and as evidence of Lyons's alleged racial animus. The statement in paragraph 27 that Lyons "discriminatorily terminated" Sylvia Johnson is stricken as a legal conclusion.

Saks objects to the statements in paragraph 28, arguing that they are based on hearsay. The statements that Leal told Carr that Lyons had called a group of African-American employees "ghetto," and that Lyons had told Leal that he wanted to "get rid of all the black

employees one by one," are double hearsay in Carr's affidavit. They are admissible as admissions in Leal's affidavit, but not in Carr's.

Saks objects to the statement in paragraph 32 that Leal told Carr that Lyons said to Leal that "there are going to be issues with Ms. Carr now that she is pregnant." This statement is double hearsay and is stricken.

Saks moves to strike paragraph 33, in which Carr stated that she went on FMLA leave in June 2004 because Lyons's "harassment" caused her to suffer pregnancy complications. Carr offers no competent evidence as to the cause of her medical difficulties. Saks also moves to strike the portion of paragraph 33 that states that Lyons hired Huynh to replace Carr during her absence and that Leal told Carr that Lyons introduced Huynh to Leal as Carr's replacement. The first part of the statement is conclusory and not based on personal knowledge. The second part is double hearsay. The motion to strike paragraph 33 is granted.

Saks moves to strike paragraph 34 because it is unsupported by specific facts. The allegations in paragraph 34 are consistent with statements provided with more particularity in Carr's deposition testimony. The motion to strike paragraph 34 is denied.

Saks also objects that paragraphs 35 and 36 conflict with Carr's deposition testimony and that Carr is not competent to testify to the cause of her pregnancy complications. The statement that Carr's second leave was due to complications "clearly related to work" is stricken as speculative and not supported by personal knowledge. Carr offers no competent evidence that her pregnancy complications were caused by work-related issues. The motion to strike this portion of the affidavit is granted.

The statements in paragraph 36—that Carr continued to contact Lorraine Keeling during her maternity leave by telephone and email to ensure that her leave was in order and that Keeling assured her that everything was fine—conflict with Carr's deposition testimony. In her deposition testimony, Carr stated that she never communicated with Keeling after she emailed her to obtain the necessary leave of absence paperwork before she left on her second leave. (Docket Entry No. 14, Ex. A at 138:4–141:5). A consistent line of authority provides that a court considering a summary judgment motion may disregard a nonmovant's affidavit that contradicts, without explanation, previous deposition testimony. *See S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996); *Thurman v. Sears, Roebuck & Co.*, 952 F.2d 128, 136 n.23 (5th Cir. 1992). "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168–72 (7th Cir. 1995). However, courts must be careful to distinguish between "discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence." *Id.* at 1169–70. In this case, the affidavit directly contradicts the deposition testimony, without any explanation. The motion to strike this portion of paragraph 36 is granted.

Paragraph 38 states Carr's personal belief that based on the allegations provided in her affidavit, she was terminated because of her race and pregnancy. The motion to strike

paragraph 38 is denied, although the law is clear that personal belief does not create a fact issue as to the reason for an adverse employment action.

### C. Margaret Johnson's Affidavit

Saks moves to strike Margaret Johnson's affidavit because Carr failed to identify Johnson as a person with knowledge of relevant facts in her Rule 26 initial disclosures. Carr does not respond to this argument. Rule 26(a)(1)(A) of the Federal Rules of Civil Procedure requires parties to disclose "each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment." FED. R. CIV. P. 26(a)(1)(A). Parties must also supplement their Rule 26 disclosures at appropriate intervals. FED. R. CIV. P. 26(e)(1). Parties who fail to satisfy these disclosure and supplementation requirements are prohibited from using the undisclosed evidence "at trial, at a hearing, or on a motion," unless the failure is harmless. FED. R. CIV. P. 37(c)(1). Because Carr failed to disclose Margaret Johnson as a person with knowledge of relevant facts and now attempts to rely on her affidavit testimony, without having afforded Saks the opportunity to depose Johnson before the end of the discovery period, this failure is not harmless. Because Carr failed to disclose to Saks that Margaret Johnson was an individual with relevant facts and did not supplement the disclosures before discovery ended, the motion to strike Johnson's affidavit is granted.

### D. Shalendra Thurston's Affidavit

Saks objects to paragraph 4 of Shalendra Thurston's affidavit, arguing that it is not supported by specific facts. In that paragraph, Thurston states that during her employment

38

at Saks, she saw Lyons discriminate against African-Americans.  This paragraph is supported by the remainder of her affidavit, in which Thurston states that she heard Lyons use derogatory and racially charged terms to describe African-American employees.  The motion to strike paragraph 4 is denied.

Saks also moves to strike paragraph 7, in which Thurston states that Leal told her that Lyons had made a derogatory comment directed to Thurston.  This paragraph is double hearsay; the motion to strike that paragraph is granted.

Saks objects to paragraphs 8 through 12 on the basis of relevance, arguing that the individuals discussed in those paragraphs are not similarly situated to Carr.  Paragraphs 8 and 9 describe Thurston's attempt to secure a job promotion to lead cashier, Lyons's denial of her request, and Lyons's decision to hire a less qualified Caucasian for that position.  Thurston is not a plaintiff and did not have a position similar to Carr's.  The evidence is not relevant to the claims that Carr asserts, with one exception.  The evidence is admissible as relevant to showing Lyons's racial animus.  The motion to strike paragraphs 8 and 9 is granted in part and denied in part.

In paragraphs 10 through 12, Thurston describes the incident in which a Saks employee cursed at a customer and not only escaped discipline but was rewarded with Lyons's approval.  Thurston's description is not based on what she saw, but on what the employee involved told her.  The motion to strike is granted on the basis of hearsay.

Saks also moves to strike paragraph 13 and 14, arguing that they are unsupported by specific facts.  Thurston stated that she saw Lyons and Scott scrutinize the returns of African-

American customers but not other customers making returns.  In paragraph 14, Thurston stated that she saw a Caucasian customer return an item from another department store without inquiry from Lyons or Scott.  The statements appear to be based on Thurston's personal observation.  The motion to strike is denied.

The motion to strike paragraph 16 is granted.  Whether Thurston was hired after a leave to finish her education is irrelevant to Carr's claims.

### E.    Sylvia Johnson's Affidavit

Saks moves to strike the statement in paragraph 7 of Sylvia Johnson's affidavit that she "was the highest selling specialist in sales" because it is unsupported by specific facts. Neither Carr nor Johnson provide any information about the basis for this statement. Saks's motion to strike paragraph 7 is granted.

Saks also moves to strike Johnson's testimony in paragraph 8 that she was subjected to and witnessed discrimination by Lyons and others.  This statement is supported by the remainder of her affidavit.  The motion to strike paragraph 8 is denied.

Saks also moves to strike the testimony in paragraph 9 that Lyons's refusal to give Johnson a raise was racially motivated.  To the extent the paragraph speculates as to Lyons's motives in refusing to give Johnson a raise, the motion to strike is granted.

Saks objects to paragraphs 10 through 14 because they conflict with Johnson's deposition testimony.  Saks does not identify those portions of Johnson's deposition testimony it believes are contradicted by these paragraphs, nor did it make the relevant

40

portions of Johnson's deposition part of the record in this case. Paragraphs 11 through 14 are, however, not relevant to Carr's claims in this case.

Saks objects to the testimony in paragraphs 15 and 16, which relate Shalendra Thurston's attempts to secure a promotion. The motion to strike these paragraphs is granted on the basis of hearsay.

Saks moves to strike the testimony in paragraph 17 that Lyons subjected African-American customers returning merchandise to greater scrutiny than other customers. Johnson appears to have personal knowledge for her statement, basing it on her observations of Lyons. The motion to strike paragraph 17 is denied.

Saks also moves to strike paragraph 18, arguing that Johnson had no personal knowledge to support the assertion that she "personally saw Mr. Lyons and Ms. Scott allow a white customer return non-Saks merchandise from Marshall's for a store credit without question." (Docket Entry No. 15, Ex. E, ¶ 18). Johnson stated that she personally observed this transaction. The motion to strike paragraph 18 is denied.

Saks moves to strike paragraphs 19 and 20, which describe the confrontation between a customer and a Saks employee and Lyons's reaction. To the extent these paragraphs are based on what Johnson saw, the motion to strike is denied. To the extent these paragraphs are based on what the employee, a coworker, said about what Lyons told her, the motion to strike on the basis of hearsay is granted.

Saks also objects to the testimony in paragraph 21 that "Nancy Scott also discriminated against African-American customers" as conclusory and factually unsupported.

41

This testimony is followed by a specific example of what Johnson felt was a discriminatory comment from Scott directed at an African-American customer. The motion to strike is denied to the extent the paragraph sets out the comment that Johnson heard Scott make. Saks also objects that the comment Johnson attributes to Scott is a "stray remark." The extent to which the comment can support a claim of discrimination is analyzed below and goes to the weight and effect of the comment, but does not exclude it as summary judgment evidence.

The objection to paragraph 22 is overruled.

Saks objects that paragraphs 23 through 25 conflict with Johnson's deposition testimony. This court does not find such inconsistencies between Johnson's deposition testimony and these affidavit paragraphs as to make the affidavit inadmissible.

Saks finally objects to paragraph 26, in which Johnson states that she routinely saw Lyons provide face-to-face customer service to non-African-American customers but never saw such service provided to African-American customers. A witness does not need to provide exact dates of discriminatory conduct or provide the precise number of times the conduct occurred. *See Harville v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 436 (5th Cir. 2005) (holding that assertions that the plaintiff was "touched 'numerous times' instead of providing exact dates or the exact number of instances" were not so "conclusory" that they should have not have been considered by the court). Johnson stated that this behavior took place "routinely." The motion to strike paragraph 26 is denied.

F.      **Jennifer Aitsebomo's Affidavit**

42

Aitsebomo is a customer whose affidavit described her interactions with Sylvia Johnson, the plaintiff in a related case.  Aitsebomo does not describe any comments made by Lyons or Scott to or in front of Carr.  The affidavit is relevant only as evidence of Lyons's racial animus.  The motion to strike is otherwise granted.

## III.     The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c).  The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact.  *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element or claim.  *Celotex*, 477 U.S. at 330.  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case.  *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  "An issue is material if its resolution could affect the outcome of the action."  *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).  If the moving party fails to meet its initial burden, the summary judgment motion must be denied, regardless of the

43

nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 302 (5th Cir. 2004). This burden is not satisfied by "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. "Rule 56 mandates the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## IV.     The Race and Pregnancy Discrimination Claims

### A.     The Legal Standard under Title VII and Section 1981

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national

origin . . . ." 42 U.S.C. § 2000e-2(a)(1).  Claims of discrimination brought under Title VII and Section 1981 require the same proof.  *Felton v. Polles*, 315 F.3d 470, 483–84 (5th Cir. 2002) (citing *Shackelford v. DeLoitte & Touche, LLP*, 190 F.3d 398, 403–04 n.2 (5th Cir. 1999)); *see also LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448 n.2 (5th Cir. 1996) ("Claims of racial discrimination brought under § 1981 are governed by the same evidentiary framework applicable to claims of employment discrimination brought under Title VII."). The inquiry under Title VII is "whether the defendant intentionally discriminated against the plaintiff."  *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 651 (5th Cir. 2004).

When a plaintiff attempts to prove allegations of discrimination through indirect or circumstantial evidence, the claims are considered under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), recently modified in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), and *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305 (5th Cir. 2004).  Under the modified *McDonnell Douglas* approach, the plaintiff has the initial burden of making a *prima facie* showing of race and sex discrimination.  *Abarca v. Metropolitan Transit Auth.*, 404 F.3d 938, 941 (5th Cir. 2005); *Rachid*, 376 F.3d at 312.  A plaintiff satisfies this burden by showing that: (1) she is a member of a protected group; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) after she was discharged, she was replaced with a person who is not a member of the protected class.  *Frank v. Xerox Corp.*, 347 F.3d 130, 137 (5th Cir. 2003); *Okoye v. Univ. of Tex. Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001); *see also Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005) ("To establish a *prima facie* case of discrimination

45

under § 1981, Appellants must establish that the: (1) are members of a protected group; (2) were qualified for the position held; (3) were discharged from the position; and (4) were replaced by persons outside of the protected group."). The fourth prong may also be met if a plaintiff shows that she was "treated differently from others similarly situated." *Abarca*, 404 F.3d at 941.

If a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for the adverse employment decision. *Cullwell v. City of Fort Worth*, 468 F.3d 868, 873 (5th Cir. 2006). If a defendant can produce such evidence, the presumption of discrimination dissolves. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43 (2000); *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002). The plaintiff must then offer evidence to create a fact issue "either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motives alternative)." *Rachid*, 376 F.3d at 312 (internal quotation and alteration marks omitted); *see also Cullwell*, 468 F.3d at 873; *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005) (analyzing a Title VII claim under the modified approach).

In a mixed-motive case, if the plaintiff shows that the illegal discrimination was a motivating factor, the defendant must respond with evidence that the same employment decision would have been made regardless of discriminatory animus. *Rachid*, 376 F.3d at 312. The plaintiff has the ultimate burden of showing a genuine issue of material fact on

46

whether the defendant discriminated against her on the basis of the plaintiff's membership in the protected class.  *Reeves*, 530 U.S. at 143.  Carr has not raised a mixed-motive theory of discrimination.  *See Turner v. Baylor Richardson Med. Ctr.*, — F.3d —, —, 2007 WL 122003, at *6 (5th Cir. Jan. 19, 2007) ("[The plaintiff] did not properly raise her mixed-motive argument below until her motion for new trial. . . . Because a motion for a new trial cannot be used to argue a case under a new legal theory, the district court was correct in finding that [the plaintiff's] mixed-motive claim was waived."); *Ward v. Midwestern State Univ.*, No. 05-10800, 2007 WL 464693, at *3 (5th Cir. Feb. 7, 2007) (unpublished opinion) (stating that the plaintiff's failure to present any argument related to a mixed-motive alternative at the district court waived any avenue for appeal on that issue); *Jones v. Overnite Transp. Co.*, No. 05-20363, 2006 WL 3627148, at *5 n.1 (5th Cir. Dec. 13, 2006) (unpublished opinion) ("[The plaintiff] waived the mixed-motive theory of intentional discrimination in the district court; therefore, application of the mixed-motive analysis falls outside the scope of this appeal.").

Congress enacted the Pregnancy Discrimination Act of 1978, which amended the definition of "sex" in Title VII to include:

> pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work.

42 U.S.C. § 2000e(k).  A claim of pregnancy discrimination is analyzed under the *McDonnell Douglas* evidentiary framework like other Title VII claims.  *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (citing *Urbano v. Continental Airlines, Inc.*, 138 F.3d 204, 206 (5th Cir. 1998)).

### B.     The Discriminatory Termination Claim

Saks argues that Carr has not made a *prima facie* showing of race or pregnancy discrimination in the decision to terminate her job in February 2005.  Saks argues that Carr cannot show that she was qualified for the assistant general manager position in February 2005, when she was discharged; that she suffered an adverse employment decision; or that she was treated differently than others who were similarly situated.

Saks does not contest that Carr is a member of a protected racial class—Carr is African-American—or that she had her first child six weeks before she was discharged.  Saks argues that Carr was not qualified for the assistant general manager position when she was discharged on February 3, 2005 because her doctor had not cleared her to return to work after the birth of her child.  Saks claims that because Carr was medically unfit to return to work in February 2005, she was not qualified for the position.

Carr had served as assistant general manager at the Fountains store since July 2002.  She had over five years of management-level experience at Saks and over ten years of experience in retail.  Saks does not argue that Carr was unqualified for the assistant general manager position for any reason other than recent childbirth.  "For purposes of the *prima facie* case analysis, a plaintiff's qualifications are to be assessed in terms of whether he or

she was meeting the employer's expectations prior to and independent of the events that led to the adverse action." *Tysinger v. Police Dept. of City of Zanesville*, 463 F.3d 569, 573 (6th Cir. 2006) (citing *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 585 (6th Cir. 2002)). The record does not permit this court to conclude as a matter of law that Carr would have been unable to return to work following her recovery from childbirth.  Saks's first argument fails.

Carr has made a *prima facie* showing that she suffered an adverse employment action. It is undisputed that Carr was discharged from her position at Saks on February 2, 2005.  She received a letter on February 15, 2005 from David Goodes dated February 2, 2005 informing her that when her short-term disability benefits were exhausted, her employment with Saks would be "separated."  (Docket Entry No. 15, Ex. H).   Job termination is an adverse employment action. *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004) ("[A]n adverse employment action consists of ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating." (citations and quotations omitted)).

Saks has provided a legitimate nondiscriminatory reason for its decision to terminate Carr's position in February 2005:  it believed she had abandoned her job.  Saks points to evidence in the summary judgment record that despite its efforts to contact Carr by telephone and in writing, she did not let Saks know of any plan to return to work or what her return date would be.  (Docket Entry No. 14 at 13).  Because Carr's FMLA leave had expired in mid-

November 2004 and Carr had not responded to written or telephone inquiries about whether or when she intended to return to work, Saks concluded that she did not intend to return.

Carr responds that the proffered reason for her job termination—that she did not give any indication that she intended to return to work—is a pretext for race and pregnancy discrimination.  (Docket Entry No. 15 at 14–15).  Carr points to the evidence of Harle Lyons's racial animus to raise a fact issue as to pretext.  The problem with Carr's argument is the undisputed evidence that Lyons had no role in the decision to terminate her employment in February 2005; he had not worked at Saks since November 2004.  Carr does not identify any other decisionmaker who exhibited racial animus toward her.

Carr relies on the evidence that she had completed and returned all the papers she was told were necessary to obtain sick leave, FMLA leave, and short-term disability benefits in October 2004.  (Docket Entry No. 14, Ex. A at 122:23–125:9).  The evidence, however, shows that Carr knew that her FMLA and sick leave expired in November 2004 and knew that she had no guarantee of a job at Saks after that occurred.  When Carr applied for her second maternity leave in October 2004, Lorraine Keeling told her that she only had three weeks of FMLA leave remaining.  (Docket Entry No. 14, Ex. A at 122:23–125:9).  Carr understood that her job was not guaranteed once her FMLA leave expired.  She believed that she would be eligible for another similar position on her return if her current job had been filled, but she did not apply for another job.  (*Id.* at 134:17–20; 136:9–14).  The FMLA allows an employer to deny an employee reinstatement if that employee's leave of absence exceeds the statutory 12-week entitlement.  *See* 29 U.S.C. § 2612(a)(1) ("[E]ligible

50

employees shall be entitled to a total of 12 workweeks of leave during any 12 month period . . . because of a serious health condition."); *see also McGregor v. Autozone, Inc.*, 180 F.3d 1305, 1308 (11th Cir. 1999) (holding that if an employer's policy provides more than 12-weeks leave, that employer "should not find itself sued for violating the FMLA"); *Hicks v. Leroy's Jewelers, Inc.*, 225 F.3d 659 (6th Cir. 2000) (unpublished opinion) (holding that an employer did not violate the FMLA when it terminated an employee who failed to return to work after 12 weeks of leave based on her own calculation of when FMLA should have begun and ended); *Hite v. Biomet, Inc.*, 53 F. Supp. 2d 1013, 1017–18 (N.D. Ind. 1999) (stating that while an employer may grant an employee more than 12 weeks of leave, the additional time is not protected leave subject to the FMLA safeguards).

Carr testified that during her leave, she returned to the store biweekly to retrieve her paychecks and on one of these visits in early 2005, she talked to Leal in human resources about her leave paperwork. (*Id.* at 139:22–140:21). Despite her knowledge that her FMLA leave had expired months earlier, Carr apparently made no inquiry about her job status. After she received written notice that she had been terminated from her position at Saks, she made no effort to ask about or apply for any other job at Saks. (*Id.* at 136:15–17). Carr continued to receive short-term disability benefits from Saks following receipt of the termination notice in February 2005. (*Id.* at 20:11–23).

The evidence does not raise a fact issue as to whether Saks's proffered reason for terminating Carr's employment was a pretext for race discrimination. Nor does the evidence raise a fact issue as to pregnancy discrimination. Carr's pregnancy-discrimination claim is

analyzed under the same *McDonnell Douglas* framework as her race-discrimination claim. *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (citing *Urbano v. Continental Airlines, Inc.*, 138 F.3d 204, 206 (5th Cir. 1998)).  The evidence in the summary judgment record on pregnancy discrimination is scant.  Carr makes cursory allegations in a single footnote that another Saks employee also alleged that she was discriminated against during her pregnancy. (Docket Entry No. 15 at 15 n.4).  The other employee Carr identifies is Margaret Johnson. This court struck Johnson's affidavit because Carr failed to identify Johnson as a person with relevant knowledge in her disclosure.  Her testimony is not part of the summary judgment record.  And even if Johnson's testimony was admitted, it is insufficient to raise a fact issue as to whether the decision to terminate Carr's employment was motivated by her pregnancy. Carr and Johnson did not have similar positions at Saks.  The person who made the decision with respect to Johnson's employment, Lyons, had left Saks months before the decision to terminate Carr's employment.   The record contains undisputed evidence that another African-American assistant general manager, Dierdre Dickens, who was hired as an assistant general manager one month after Carr left, took maternity leave and was expected to return to work in the same position at Saks.  (Docket Entry No. 14, Ex. E at 128:3–14).  There is no summary judgment evidence that Saks treated other employees outside Carr's protected classes more favorably; that is, there is no evidence that other non-African-American or nonpregnant individuals who took leave that exceeded their allotted FMLA leave and sick leave, and who gave no indication whether or when they would return to work, were allowed to remain as Saks employees.  The summary judgment evidence does not raise a genuine

issue of fact as to whether Saks discriminated against Carr on the basis of sex when it decided to terminate her job in February 2005.

### C.    The Discipline and Demotion Claim

Carr also alleges that after her complaint to Suzanne Johnson in September 2003, she received the first negative review in her eight-year career at Saks and was demoted from her assistant general manager position the following year.  (Docket Entry No. 15 at 20).  Her performance reviews came in March and April 2004.  The initial "corrective interview" came two days after Carr had a hostile encounter with a coworker.  The write-up stated that Carr needed to work on her communication skills with her coworkers and subordinates.  The second written warning came one month later and reflected Lyons's determination that Carr had not adequately corrected her performance.  Carr vehemently disputes the accuracy of these allegations in her written rebuttals and argues that she was singled out for disparate discipline because other employees who engaged in similar conduct were not punished.  Saks has submitted undisputed summary judgment evidence that other, non-African-American employees received similar punishment for similar behavior.  There is no basis to find that the performance write-ups in March and April 2004 were discriminatory.

Carr has made a *prima facie* showing that when she returned to work in August 2004 after a two-month paid leave for pregnancy complications, she was demoted from her job as assistant general manager and was left with the job of managing only the women's department.  (Docket Entry No. 15 at 12–14).  A demotion is an adverse employment action under Title VII.  *See Evans v. City of Houston*, 246 F.3d 344, 353 (5th Cir. 2001) (citing

*Sharp v. City of Houston*, 164 F.3d 923, 933 & n.21 (5th Cir. 1999)); *Southard v. Tex. Bd. of Criminal Justice*, 114 F.3d 539, 555 (5th Cir. 1997).

Saks responds that when Carr returned to work in August 2004, she held the same job title and earned the same salary as before she went on leave.  Saks acknowledges that Claire Hyunh had been hired during Carr's leave as an assistant general manager, but that she was hired in addition to, rather than as a replacement for, Carr.  Saks attempts to distinguish Carr's and Huynh's job duties as entirely different from one another.  Saks argues that Carr was an assistant general manager in charge of merchandise and managed the women's department while Huynh was assistant general manager of operations and served as the store's human resources manager.  (Docket Entry No. 14 at 16).  But this assertion conflicts with other summary judgment evidence, such as Huynh's "Associate Hire Confirmation Report."  (Docket Entry No. 14, Ex. D).

Carr points to concrete and specific changes in her job duties to support her argument that she was essentially replaced by Hyunh.  Carr described her position when she returned as "an AGM with limited access."  (Docket Entry No. 14, Ex. A at 69:17).  Carr asserts that as a result, her job was objectively less prestigious and her subordinates no longer acknowledged her as the assistant general manager.  Carr has presented evidence that during Carr's absence, Hyunh was introduced as her replacement.  When Carr returned, she was no longer given access to the census sheet, a privilege given to upper management; her name was removed from the contact sheet and Hyunh's name put in its place; she was no longer authorized to change the employee schedules; and Hyunh conducted new applicant

54

interviews.  There is a dispute as to whether Lyons replaced Carr with Hyunh as assistant general manager and demoted her during her leave.

The record shows that Lyons gave Huynh many of the assistant general manager responsibilities that Carr held before her leave, including scheduling, interviewing new applicants, and acting as a point-of-contact for store emergencies.  (Docket Entry No. 14, Ex. A at 69:15–90:14; Docket Entry No. 15, Ex. B, ¶ 34).  The summary judgment evidence of Lyons's racial animus supports an inference that Carr was effectively demoted in August 2004 based on her race.  The motion for summary judgment dismissing the claim of a racially discriminatory decision to demote Carr in August 2004 is denied.  There is no similar evidence that the demotion was the result of pregnancy discrimination; summary judgment is granted as to that claim.

### D.    The Unequal Pay Claim

To make a *prima facie* showing of discrimination in compensation, a plaintiff must show that she is a member of a protected class and is paid less than a nonmember for work requiring substantially the same responsibilities.  *See Uviedo v. Steves Sash & Door Co.*, 738 F.2d 1425, 1431 (5th Cir. 1984).

The record shows that Carr made $40,400 at the time she was fired, (Docket Entry No. 14, Ex. A at 96:6–8); and that Huynh earned $50,000 when she was hired.  (Docket Entry No. 14, Ex. D).  The record also shows that Huynh took over at least some of Carr's responsibilities as assistant general manager, including scheduling employee work hours, interviewing new applicants, receiving the census sheet, and being publicly listed as the

55

assistant general manager on the contact sheet.  There is a disputed fact issue as to whether Huynh and Carr had similar job responsibilities.  Carr has made a *prima facie* showing of unequal pay during the time that Lyons was the store manager.

Saks states that Huynh was paid more than Carr because she had significantly more experience in management than Carr.  On her Saks job application, Huynh stated that she had been a store manager for a large retail clothing store from 2001 until she was hired at Saks, and a senior area manager with oversight of three to four departments at another store, where she worked from February 1976 until July 2001.  (Docket Entry No. 14, Ex. D).  When Hyunh applied for the position at Saks, she was earning $45,000 as the store manager for her prior employer.  (*Id.*).  Huynh stated on her application that she received "Outstanding Achievement" and "Outstanding Charge Performance" awards from her previous employers. (*Id.*).  By contrast, Carr had worked in retail since the mid-1990s.  Her management experience was limited to managing the men's department in the Saks store in Tucson. (Docket Entry No. 14, Ex. A at 36:14–16).  Carr does not offer evidence to rebut Saks's proffered reason for paying Huynh a higher salary.  The undisputed evidence shows that Huynh had approximately 20 years more experience in retail than Carr and significantly more management experience.  There is no disputed fact issue material to determining whether Carr's disparity in pay as compared to Huynh was based on either race or pregnancy.

The record shows that after Saks discharged Carr in February 2005, her first replacement was Theresa Pina, a Caucasian, who earned $1875 per pay period compared to Carr's $1683.33.  (Docket Entry No. 15, Ex. G).  Saks admits that it hired Pina to replace

Carr.  (Docket Entry No. 14 at 9).  A month later, Pina left and the position was filled by Dierdre Dickens, who is African-American and made $2,000 per pay period.  (Docket Entry No. 15, Ex. G).  The evidence is undisputed that when these individuals were hired, Lyons was no longer employed with Saks.  There is no evidence as to any race or sex discrimination on the part of Candace White, Lyons's replacement, or any other relevant decisionmaker at Saks.  The evidence does not support an inference of race or sex discrimination as the basis for Carr's compensation.

Carr also alleges a disparate impact theory to support her claim of unequal compensation.  To establish a disparate impact claim, a plaintiff must show that there is a specific, facially neutral employment practice, that there is a statistically significant disparity among members of different groups affected by the practice, and that there is a causal nexus between the facially neutral employment practice and the statistically significant disparity.  Disparate impact claims, recognized in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), do not require proof of intent to discriminate.  A plaintiff must identify specific practices as responsible for the asserted disparities, *see Johnson v. Uncle Ben's, Inc*., 965 F.2d 1363, 1367 (5th Cir. 1992), and must present a systemic analysis of those employment practices. *See Black Fire Fighters Ass'n v. City of Dallas*, 905 F.2d 63, 63 (5th Cir. 1990).

Once it is shown that the employment standards are discriminatory in effect, the employer must meet "the burden of showing that any given requirement (has) . . . a manifest relationship to the employment in question."  *Dothard v. Rawlinson*, 433 U.S. 321 (1977). If the employer proves that the challenged requirements are job-related, the plaintiff may

then show that other selection devices without a similar discriminatory effect would also "serve the employer's legitimate interest." *Id.*; *see also Connecticut v. Teal*, 457 U.S. 440, 447 (1982) (stating that a Title VII plaintiff may still prevail after an employer-defendant's showing of business necessity "if he shows that the employer was using the practice as a mere pretext for discrimination"); *Int'l Bhd. of Elec. Workers v. Miss. Power & Light Co.*, 442 F.3d 313, 317 (5th Cir. 2006) (stating that the plaintiff, rather than the defendant, has the burden of showing acceptable alternative employment practices).

In her First Amended Original Complaint, Carr alleges that "Saks has maintained a system for making promotion and compensation decisions that is excessively subjective and which has a disparate impact on Plaintiff and other African-American and female employees." (Docket Entry No. 7 at 6). Carr has not identified any facially neutral employment policy or practice that resulted in a significantly adverse impact on African-American or pregnant employees. *See Page v. U.S. Indus., Inc.*, 726 F.2d 1038, (5th Cir. 1984). Carr instead presented evidence that individual acts and decisions of Harle Lyons as store manager resulted in the discrimination Carr alleges. There is no evidence of facially neutral employment practices or policies that resulted in a statistically significant disparity among members of different groups affected by the practice, or of a causal nexus between the facially neutral employment practice and the statistically significant disparity. The disparate impact theory of unequal compensation fails as a matter of law.

Summary judgment is granted as to Carr's claim of unequal compensation.

### E.     The Failure to Promote Claim

To make a *prima facie* showing of discriminatory failure to promote, a plaintiff must show that: (1) she is a member of a protected class; (2) she sought and was qualified for an available position; (3) she was not selected for that position; and (4) the employer awarded the position to someone outside the protected class. *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 680–81 (5th Cir. 2001); *see also Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 317 (5th Cir. 2004).

Carr has established that she was a member of a protected class. The summary judgment evidence, however, precludes a showing as to the other three prongs of her *prima facie* case. There is no evidence that Carr sought an available promotion, that a position was available, that she was denied that position, or that a nonmember of the protected class filled the vacancy. Carr was employed as the assistant general manager for over two years and the record shows no indication that she desired or sought any other position. There is a fact issue as to whether she was demoted as a result of discrimination while Lyons was the general manager, but there is no fact issue as to whether she sought or was denied a promotion. Saks's summary judgment motion on Carr's failure to promote claim based on race and pregnancy discrimination is granted.

## V.    The Hostile Work Environment Claim

In a Title VII hostile work environment claim, the elements of a *prima facie* case are that: (1) the plaintiff belongs to a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her being a member of the protected class; and

(4) the harassment complained of affected a "term, condition or privilege of employment."[3] *Harvill v. Westward Commn's, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005); *see also Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 381 (5th Cir. 2003) (citing *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999)).  If the plaintiff alleges that the harassment culminated in a tangible employment action, such as discharge, demotion, or reassignment, the employer may be vicariously liable for the harassment.  If no such tangible employment action is alleged, the issue is whether the harassment was sufficiently severe or pervasive as to alter a term or condition of employment.  *See Burlington Indus. v. Ellerth*, 524 U.S. 742, 753–54 (1998); *see also Jones v. Flagship Int'l*, 793 F.2d 714, 719–20, 721–22 (5th Cir. 1986).

For supervisor harassment to be actionable as a hostile work environment claim, it must be "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment."  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).  "To be actionable, the challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so."  *Harvill*, 433 F.3d at 434 (citing *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999)).  Determining whether an environment is offensive or abusive requires an *ad hoc* analysis, focusing on factors such as the "frequency of the discriminatory conduct; its severity; whether it is

---

[3] Hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 n.10 (2002) (citing *Faragher v. Boca Raton*, 524 U.S. 775, 786–87 & n.1 (1998) and *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66–67 (1986)).

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993); *Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir. 2000). The Supreme Court has repeatedly stated that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)).

Carr alleges that she was subjected to a racially hostile work environment during the time Harle Lyons was the store manager. (Docket Sheet No. 15 at 18). She points to evidence that Lyons "often" used the term "nigger" to refer to African-Americans; that Lyons called Clarissa Ashley, another Saks employee, a "black bitch"; that Lyons routinely scrutinized the returns of African-American customers more closely than returns made by customers of other races; that Lyons allegedly installed an additional security camera to monitor the African-American employees; that Lyons praised a non-African-American employee for her aggressive verbal altercation with a customer; and that Lyons did not discipline Nancy Scott for racist comments she made to an African-American sales person and customer. Carr alleges that these incidents and comments created a hostile working environment.

The evidence does not raise a fact issue was to whether Carr suffered a hostile work environment. The evidence shows that Lyons did not direct racially offensive comments to Carr or use them in front of Carr. (Docket Entry No. 15, Ex. B, ¶ 11). Carr instead testified

that other Saks employees told her of Lyons's disparaging remarks.  When she discussed it with Lyons, he told her that his comments had been taken out of context.  Such "second-hand" harassment carries less evidentiary weight.  *See, e.g.*, *Moser v. Indiana Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005) (stating that "second-hand harassment," although relevant, carries less weight than remarks or actions directed at the plaintiff); *Jennings v. Univ. of N.C.*, 444 F.3d 255, 272 (4th Cir. 2006) (same); *McKenzie v. Milwaukee County*, 381 F.3d 619, 624–25 (7th Cir. 2004) (holding that the plaintiff's hostile work environment claim failed because many of the incidents complained of were not directed toward the plaintiff); *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 759–60 (8th Cir. 2004) (holding that the plaintiff had failed to present sufficient evidence that harassment was severe where comments were not directed toward him, did not refer to him, and in some instances were merely overheard by him); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997) (the fact that most of the comments were not directed at the plaintiff contributes to the conclusion that the evidence was insufficient to show a hostile work environment).

Carr alleges other incidents that she asserts establish race-based harassment.  Carr alleges that Lyons told Carr's associates in the women's department that Carr had not invited them to her wedding.  According to Carr, this made her working relationships with these employees more difficult, although she was able to make those relationships work.  (Docket Entry No. 14, Ex. A at 158:2–4).  Carr also alleges that after her May 2003 performance evaluation (in which she received a raise), when she complained about the wedding comments and other issues, Lyons angrily slammed his hand on the table and said that he

"didn't appreciate my feedback and that he didn't need it." (*Id.* at 162:11–14).  Shortly after that meeting, Lyons forwarded to Carr an email describing a "formula for success" that included "asskissing" and "bullshitting" as two techniques for advancement.  (*Id.* at 165:4–21).  The email was sent only to Carr.  She found it offensive.

A few months after this incident, Lyons reportedly told several corporate officers that Carr was planning to quit.  This followed a conversation in which Carr complained about an incident at work.  Carr acknowledged that in that conversation, she did tell Lyons that she was frustrated and ready to quit.  Lyons then contacted the corporate human resources department and Paul Gedwed telling them what Carr had said.  Carr complained about Lyons to upper management, stating that she had no intention of resigning.  She was encouraged to remain on the job and to talk to Lyons to try to clear up any misunderstandings.  (*Id.* at 180:1–7).  Carr complains that after this meeting, Lyons scheduled her to work consecutive Saturday nights.  She also complains that she was scheduled to work five consecutive days on her return from her first maternity leave in August 2004.

Carr has not shown that she was subjected to harassing behavior "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment."  *Vinson*, 477 U.S. at 67.  The conduct must be both objectively and subjectively offensive.  *Harvill*, 433 F.3d at 434.  Carr's hostile work environment allegations and summary judgment evidence amount to her learning that Lyons, the store manager from late 2002 until late 2004, had used racially offensive terms in front of other employees and had been seen subjecting African-American customers and employees to

greater scrutiny; receiving an email that used inappropriate (but not racially offensive) language; having some difficulties with her subordinate employees; having two meetings with Lyons in which he dismissed her efforts to talk about these issues with him; and being required to work on consecutive days or Saturdays.  Although offensive, these encounters do not rise to the level of objectively severe or pervasive.  Carr herself did not see or hear any of the comments Lyons allegedly made.  The incidents that affected her directly were infrequent; the meetings, email, and one scheduling incident occurred over a four to five month period and the other scheduling incident happened one year later.  The difficulties with her subordinates occurred after Carr returned from her honeymoon—a date not disclosed in the record, but presumably some time after Lyons began working at Saks in late 2002 and before the May 2003 performance evaluation in which Carr brought the incident to Lyons's attention.  (Docket Entry No. 14, Ex. A at 158:13–25).  Taking into account all the circumstances, the nature and frequency of the incidents complained of fall short of the level the cases require to raise a fact issue as to whether the conduct was sufficiently severe or pervasive to affect Carr's working conditions.  *Compare Turner v. Baylor Richardson Med. Ctr.*, — F.3d —, —,  2007 WL 122003, at \*7 (5th Cir. Jan. 19, 2007) (holding that supervisor's infrequent and isolated comments directed to the plaintiff about "ghetto children" and other racially insensitive remarks did not rise to the level of severe or pervasive); *and Septimus v. Univ. of Houston*, 399 F.3d 601, 612 (5th Cir. 2005) (holding that one two-hour "harangue" by a supervisor, that supervisor's use of a mocking tone on one occasion, and another supervisor's comment comparing the plaintiff to a "needy old

girlfriend" did not collectively amount to a severe or pervasive working environment); *with Harvill*, 433 F.3d at 435–36 (holding that district court erred in not finding a fact issue as to whether repeated groping, kissing, and fondling of plaintiff's breasts and buttocks, and lewd comments about her sex life during a seven-month period was severe or pervasive); *and Walker*, 214 F.3d at 619–22 (holding that hostile work environment claim survives because evidence showed that plaintiff was subjected to years of disparaging comments made to and about her, including "nigger" and "little black monkey").

Carr alleges that she had to take leave during her pregnancy because of work conditions. (Docket Entry No. 15, Ex. B, ¶¶ 33, 35). But the record is devoid of any evidence as to the medical reason for Carr's leaves. These self-serving statements cannot defeat summary judgment because they are without factual support in the record. *See BMG Music v. Martinez*, 74 F.3d 87, 91 (5th Cir. 1996) (affirming summary judgment for the plaintiffs because "the only evidence in support of the defendants' theory is a conclusory, self-serving statement by the defendant"); *see also United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001) (affirming summary judgment for the plaintiff because the defendant's only evidence consisted of "self-serving allegations," which "are not the type of significant probative evidence required to defeat summary judgment" (internal quotation marks and citation omitted)). Carr has failed to raise a disputed fact issue material to determining whether the alleged harassment was so severe or pervasive as to alter the conditions of her employment and create an abusive working environment. Saks's summary judgment motion as to Carr's hostile work environment claim based on race is granted.

As to her hostile work environment claim based on pregnancy, Carr's claim fails as a matter of law. She has made no allegation that she was subject to any harassment because she was pregnant. Saks granted Carr the medical leave she requested, with pay. This claim is dismissed, with prejudice.

## VI.    The Retaliation Claims

Title VII makes it an unlawful employment practice for an employer to "discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To make a *prima facie* case of retaliation under either Title VII or Section 1981, a plaintiff must show that: (1) she engaged in an activity protected by Title VII; (2) she was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action." *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004).

The *McDonnell Douglas* framework applies to Title VII retaliation claims. If a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to proffer a legitimate rationale for the underlying employment action. If the defendant makes this showing, the burden shifts back to the plaintiff to demonstrate that the employer's articulated reason for the employment action was a pretext for retaliation. *Id.* The standard of proof at the pretext stage requires the plaintiff to show that the adverse employment action would not

have occurred but for her protected conduct.  *Septimus v. Univ. of Houston*, 399 F.3d 601

(5th Cir. 2005); *Pineda v. United Parcel Serv., Inc*., 360 F.3d 483, 487 (5th Cir. 2004).

Title VII protects an employee who opposes any unlawful employment practice.  42

U.S.C. § 2000e-3(a).  To satisfy the 'opposition clause,' [the plaintiff] need not prove that

[his employer's] practices were actually unlawful, but only that he had 'a reasonable belief

that the employer was engaged in unlawful employment practices.'"  *Byers v. Dallas*

*Morning News, Inc.*, 209 F.3d 419, 428 (5th Cir. 2000) (citing *Payne v. McLemore's*

*Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. 1981), *cert. denied*, 455 U.S. 1000

(1982)).

In *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S. Ct. 2405, 2414

(2006), the Court held that the anti-retaliation provision protects an individual "not from all

retaliation, but from retaliation that produces an injury or harm."  *Id.*  "[A] plaintiff must

show that a reasonable employee would have found the challenged action materially adverse,

which in this context means it well might have dissuaded a reasonable worker from making

or supporting a charge of discrimination."  *Id.* at 2415 (quotations omitted).  The standard

for harm is objective.  *Id.* at 2407.  The harm must be material; Title VII does not protect an

employee from trivial harms, "petty slights or minor annoyances that often take place at work

and that all employees experience."  *Id.* at 2415.  The significance of any given act depends

on the particular circumstances of the individual employee.  *Id.* at 2415.

To demonstrate the causal prong of the *prima facie* retaliation claim on summary

judgment, a plaintiff must at least raise a question about whether the person who subjected

her to an adverse employment action was aware of the protected activity. *See Davis*, 383 F.3d at 320 (citing *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 883 (5th Cir. 2003) ("[I]n order to establish the causation prong of a retaliation claim, the employee should demonstrate that the employer knew about the employee's protected activity.")). "At this threshold stage, the standard for satisfying the causation element is 'much less stringent' than a 'but for' causation standard." *Fierros v. Tex. Dep't of Health*, 274 F.3d 187, 191 (5th Cir. 2001).

The record shows that Carr engaged in two protected employment activities. The first occurred when she complained to Suzanne Johnson, the Saks chief executive officer, in September 2003 that Lyons was discriminating against her because of her race. (Docket Entry No. 14, Ex. A at 170:8–19; 179:15–18); *Fierros v. Tex. Dept. of Health*, 274 F.3d 187, 194 (5th Cir. 2001) (stating that the filing of an internal discrimination complaint is a Title VII protected activity). This occurred after Lyons sent Carr the email she found offensive and told Gedwed and others that Carr was going to resign. The second protected act occurred when Carr filed her complaint with the EEOC on October 20, 2004, alleging race and pregnancy discrimination. *Harvill*, 433 F.3d at 439 ("The filing of an EEOC complaint is clearly a protected activity within the meaning of the statute."). Carr has established the first prong of her *prima facie* retaliation case.

As to Carr's complaint to Johnson in September 2003, four possible adverse employment actions exist. Shortly after Carr complained to Johnson, Lyons required Carr to work consecutive Saturday nights. In March 2004, Lyons gave Carr a negative written

performance review, followed by another similar review a month later.  Carr claims that she was demoted in August 2004.  Finally, Carr's employment was terminated in February 2005.

After Carr complained to upper management about Lyons in September 2003, she was told to talk with him and try to work out their difficulties.  Carr states that in that meeting, Lyons told her "I know that you went to corporate.  I already know that you sent them the email.  They don't care. They don't see anything wrong with it. They're going to support me regardless." (*Id.* at 181:18–23).  Carr alleges that after her complaint to Suzanne Johnson and her follow-up discussion with Lyons, he scheduled her to work consecutive Saturday nights. (*Id.* at 185:16–25).  When she complained about the scheduling, it was changed.  But, Carr states, within a few months, she was scheduled to work consecutive Saturday nights again. (*Id.*).  Carr testified that there were four managers working at the Fountains store.  If they rotated the Saturday evening shift among themselves, no one had to work consecutive Saturday nights.  (Docket Entry No. 14, Ex. A at 185:1–6).

Under *Burlington*, the issue is whether "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 126 S. Ct. at 2415.  There is no basis to conclude that working consecutive Saturday nights might have prevented a reasonable employee from complaining.  It certainly did not have that effect on Carr, who continued to make complaints to and about Lyons. (Docket Entry No. 14, Exs. A-2 & A-4).

Carr also alleges that after her complaint about Lyons to Suzanne Johnson in September 2003, she received the first written warnings in her eight-year career at Saks and that in the following year, she was demoted from her assistant general manager position. (Docket Entry No. 15 at 20).  The written warnings came in March and April 2004.  The record shows that the written warnings issued six months after Carr had complained to Johnson about Lyons's behavior.  *See Grizzle v. Travelers Health Network, Inc.*, 14 F.3d 261, 268 (5th Cir. 1994) (finding a period of five months between employee's complaint and her discharge insufficient by itself to support an inference of causation).  It is undisputed that the first written warning came after Carr had a verbal altercation with a coworker.  Although Carr asserted that she was singled out for the reprimand, the evidence showed that in fact, both Carr and the other Saks employee involved in the altercation received written warnings.  Nancy Scott also received a "corrective interview" on March 10, 2004.  Saks also presented summary judgment evidence that other employees who had not complained about discrimination received written warnings.  (Docket Entry No. 14, Exs. B & C).  Carr has not identified evidence that supports an inference that the negative performance reviews were in retaliation for her complaint.  There is no basis to find that the performance write-ups in March and April 2004 were retaliatory.

Carr alleged and presented summary judgment evidence that when she returned from a two-month paid leave in August 2004, her assistant general managers' duties had been taken away and she had been demoted.  Carr raised a fact issue material to determining

whether she was demoted due to race discrimination. The record also raises a fact issue material to determining whether Lyons demoted her in retaliation for complaining about him.

The record does not, however, raise a fact issue as to whether Saks's decision to discharge Carr in February 2005 was linked to her complaint to Saks management about Lyons or her complaint to the EEOC about Lyons. Harle Lyons left Saks in November 2004. The record does not show that he was involved in the decision to fire Carr in February 2005. The record does not present evidence that raises a fact issue as to whether the decision to terminate Carr's position after she had exhausted her FMLA leave and failed to tell Saks whether and when she intended to return to work was in retaliation for her complaints. Saks's summary judgment motion on Carr's retaliation claims is granted except as to the claim that she was demoted in August 2004 in retaliation for complaining about Lyons.

## VII.   Conclusion

Saks's motion to strike the affidavit testimony submitted in response to the summary judgment motion is granted in part and denied in part. Saks's summary judgment motion is granted as to Carr's claims of pregnancy and race discrimination and retaliation, except the claim that she was demoted from her position as assistant general manager in August 2004 based on race and retaliation.

A status conference is set for **March 23, 2007, at 9:00 a.m.** to set a schedule for resolving the remaining claims.

SIGNED on February 26, 2007, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge